# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-1495

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff - Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the Eastern |
| | * | District of Arkansas. |
| James Carter, | * | |
| | * | |
| Defendant - Appellant. | * | |

_____

Submitted: January 13, 2005
Filed: July 5, 2005

_____

Before RILEY, JOHN R. GIBSON, and GRUENDER, Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.

James Carter appeals from the sentence imposed on him after he pleaded guilty to one count of conspiracy to commit wire fraud, 18 U.S.C. § 371 (2000), and eleven counts of wire fraud, 18 U.S.C. § 1343 (2000), in connection with home mortgage loans made through Carter's loan brokerage business. The loans were based on falsified applications that overstated the value of the homes. Carter's sentence of 18 months' imprisonment, four years' supervised release, and restitution of $181,774.93 payable to the lenders, was based on the district court's assessment of the loss from the fraud. We affirm the sentence of imprisonment but remand for further consideration of the restitution order.

We take the facts from the indictment to which Carter pleaded guilty. Carter was in the loan brokerage business in Little Rock. From February 2000 to October 2001, Carter and Kerrie Joiner falsified documentation on eleven loans to obtain greater loans than the lender would have otherwise lent on the homes being financed. Carter sent falsified documentation to the lenders stating a sales price higher than the true sales price. Carter used false gift letters, purporting to show that the borrower had been given money from relatives or friends for the down payment; sham second mortgages; and false information on HUD-1 statements to obtain the inflated loans. The lenders would wire the money to fund the loan to Beach Abstract and Guaranty Company, the closing and title company. Joiner, who was the escrow agent for Beach Abstract, helped Carter by issuing checks from Beach Abstract payable to entities controlled by Carter, Circle CM Enterprises Ltd. Co. or River City Contracting. Carter would negotiate the checks. Some of the proceeds were used to make the down payment and pay closing costs, but the rest of the money Carter and Joiner kept.

Carter and Joiner were indicted together. Joiner entered an agreement with the government agreeing to be liable for restitution in the amount of $80,429. Carter pleaded guilty without benefit of a plea agreement.

At the sentencing hearing, Carter testified that the loans in question were subprime loans because the borrowers had low credit rating scores. The lenders required a down payment before they would lend money on the house, and they were generally not willing to lend more than 80 to 85% of the house's value. The FBI agent who investigated the case, Drew McCandless, testified that Carter would falsify the house sale contract in order to apply to the lenders for a loan amount greater than the sales price agreed to by the parties. The lender would then lend more money than the 80 or 85% of the sales price that it intended to lend. The money would be wired to Beach Abstract before the closing. Joiner would draw a check on Beach Abstract's account payable to Carter's company, Circle CM, and in one case, River City Contracting. Carter would deposit the check at Pinnacle Bank, then obtain a cashier's

check to cover the down payment and closing costs. Carter would also keep some of the money himself and give some to Kerrie Joiner. Carter testified that he had used some of the money given to Circle CM to do repairs on the houses, but Agent McCandless testified that he did not know of any instance of Carter repairing a house, although he knew of one case where Carter promised to do repairs, but did not do them.

The government submitted an exhibit showing that the total amount of checks received by Circle CM was $149,288.43 and the total fees received by Carter as broker on the loans was $32,486.50. Based on the sum of these numbers, the government contended that Carter's total gain, and hence the total loss amount, was $181,774.93. Carter contended that some of the moneys paid to Circle CM were used to pay down payments and other costs for the borrowers and some of the fees were paid to the lenders, not retained by Carter. The government's witness, Agent McCandless, stated that he did not know whether any of the mortgages had been foreclosed:

> Q: So these mortgages are actually being paid?
> A: I don't know about that. I know there's a couple of them that were behind when I talked to them.
> . . .
> Q: Do you have any documentation showing what loss these banks suffered on these loans?
> A: No.
> Q: So you just did your own calculations, you talked to the banks, but you don't have anything showing that they lost any money?
> A: Right. No loans that I know of have been foreclosed at this point.

Carter was sentenced under U.S.S.G. § 2F1.1 (2000), which had been deleted from the Sentencing Guidelines by the time of sentencing, see U.S.S.G. App. C vol. II amendment 617 (effective Nov. 1, 2001), but which the parties agree is applicable, presumably to avoid an ex post facto problem. See U.S.S.G. § 1B1.11 (2004)

(Guidelines manual in effect on date of sentencing used unless it would violate the ex post facto clause; in that case, earlier version of manual should be used in its entirety).

The presentence report arrived at a total offense level of 14, by adding the base offense level of six from § 2F1.1; six levels as a specific offense characteristic resulting from the loss of $80,429 (the amount the government had stipulated to in Joiner's case); a two-level enhancement for more than minimal planning; another two-level enhancement for role in the offense; and a two-level reduction for acceptance of responsibility. The court found that the amount of loss was $181,774.93, not the $80,429 listed in the presentence report:

> After carefully considering the totality of the circumstances involved in this matter, the Court finds–and this is central–that Mr. James Carter was the moving force in this alleged scheme. He was the leader and the director. And the Court finds that the government has established by a preponderance of the evidence that the total loss is in the neighborhood of $181,774.93. And given the circumstances, the Court is persuaded that this is a reasonable estimate of the loss since the amount paid to the defendant company was used to continue the fraud, and any amount paid to him directly, through closing, to which he had no lawful claim for services, as testified to by the FBI agent, services allegedly rendered would also be considered as fraudulent.

By finding a loss amount of $181,774.93 instead of the $80,429 in the presentence report, the court raised the offense level to 15. The resulting sentencing range was from 18 to 24 months. The court sentenced Carter to 18 months, with a term of supervised release of four years.

The court asked for further briefing on the issue of whether the sentence should include an order of restitution, and if so, whether it should be in the amount of $181,774.93 or in the $80,429 amount for which Joiner was assessed. The court held that Carter was liable for restitution in the amount of $181,774.93, which represented

-4-

the amount by which he was unjustly enriched; of that amount, $80,429 was joint and several with Kerrie Joiner's liability. The court filed an amended judgment listing restitution orders in favor of the five lenders that lent the money for the mortgages.

On appeal, Carter contends that the district court erred in basing his sentence on the $181,774.93 loss figure, since the government failed to prove that the lenders had actually lost any money or that Carter had not intended for the loans to be repaid. Secondly, he argues since there is no proof that the financial institutions have lost any money from his fraud, there is no basis for a restitution order in their favor.

The day before this case was argued in this court, the Supreme Court decided United States v. Booker, 125 S. Ct. 738 (Jan. 12, 2005). Booker declared:

> Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt.

Id. at 756. Any sentence imposed in violation of this rule would violate the Sixth Amendment. To avoid such violations of the Sixth Amendment, the Supreme Court excised the portion of the federal sentencing statute that made the United States Sentencing Guidelines mandatory and the portion of that statute that set forth standards of review on appeal. Id. at 764. From thenceforth, we must review sentences to determine whether they are reasonable in light of 18 U.S.C. § 3553(a). 125 S. Ct. at 765-66. We have determined that reasonableness review applies only to the district court's determination of the appropriate ultimate sentence, so we continue our previous practice of reviewing the district court's application of the sentencing guidelines de novo and the district court's findings of fact for clear error. United States v. Mathijssen, 406 F.3d 496, 498 (8th Cir. 2005). In particular, we review for clear error the district court's determination of the amount of a restitution order.

United States v. Fogg, 2005 WL 1186535, No. 04-2723, slip op. at 9 (8th Cir. May 20, 2005).

The first question is whether the district court erred in basing the amount of "loss" under U.S.S.G. § 2F1.1(b)(1) on unjust enrichment, rather than actual or intended loss to the victim of the fraud (whether the victim is the borrower or the lender). Application note 8 to section 2F1.1 stated with regard to fraud generally: "[L]oss is the value of the money, property, or services unlawfully taken . . . .[I]f an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss." Application note 8(b) deals specifically with fraudulent loan application cases:

> In fraudulent loan application cases and contract procurement cases, the loss is the actual loss to the victim (or if the loss has not yet come about, the expected loss). For example, if a defendant fraudulently obtains a loan by misrepresenting the value of his assets, the loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered (or can expect to recover) from any assets pledged to secure the loan. However, where the intended loss is greater than the actual loss, the intended loss is to be used.

The comments on fraudulent loan application cases thus specify a measure of loss to the victim, rather than unjust enrichment to the wrongdoer. However, application note 9 stated: "The offender's gain from committing the fraud is an alternative estimate that ordinarily will underestimate the loss." In some situations, unjust enrichment is a proper measure of the loss under § 2F1.1. United States v. Badaracco, 954 F.2d 928, 938 (3d Cir. 1992).

Nevertheless, an unjust enrichment measure is problematic in Carter's case. Carter caused fraudulent loan applications to be made for other people, not for Carter himself to borrow the money. The presence of three parties in each transaction, rather than two, complicates the assessment of loss and enrichment. The government made

no attempt whatsoever to prove how much of the loan money disbursed to Carter via the Circle CM company was retained by Carter and how much was used as down payments, but it is undisputed, even pleaded in the indictment, that some of the money was used for down payments and closing costs. The money that was used for down payments and closing costs was applied for the benefit of the buyers and so was not unjust enrichment to Carter. Thus, to the extent the district court held that every cent that passed through Circle CM was unjust enrichment to Carter, the holding was clearly erroneous.

However, the amount by which Carter caused the loans to be overfunded is still a good measure of the lenders' losses in this case. The government argues that the fraudulent applications caused the lenders to lend more money than they would have otherwise lent on the collateral and also to undertake loans with a higher risk of default, since a loan in which the borrower has no equity is riskier than a loan in which the borrower has the incentive to protect his equity. Both propositions are quite true. Both propositions lead to the conclusion that, even if no mortgages have been foreclosed so far, the lenders have still suffered a loss, since they have been left with riskier, hence less valuable loans than they meant to contract. Moreover, even though Carter testified that he thought the loans would be repaid, Carter intended to leave the lenders with loans that were riskier and less valuable than the lenders thought.

The question is how to place a value on the lenders' loss or the loss that Carter intended to inflict. "The court need not determine the value of the loss with any degree of precision; a reasonable estimate of the loss based on the available evidence will suffice." United States v. Wells, 127 F.3d 739, 748 (8th Cir. 1997) (interpreting former § 2F1.1). The government has not tried to quantify the dollar amount of loss to the lenders of the increased risk from lending to persons with no equity in the collateral. But as to the increased risk from lending excessive amounts of money on the collateral, there is a rough measure of the loss. We infer from the testimony that the amount disbursed to Circle CM on each loan was the same amount as that by

which the fraudulently-obtained loan exceeded the amount that the lenders would have lent on the property had they known its true value. The total of the amounts disbursed to Circle CM was $149,288.43. In <u>Kok v. United States</u>, 17 F.3d 247, 250 (8th Cir. 1994), we held that the amount by which the fraudulent loan exceeded what the lender would have lent on the true facts was an acceptable measure of the loss:

> [A]s a result of Kok's false representations, Western extended the line of credit beyond the amount it would have allowed had it been aware of Component's true financial status. Thus, the measure of the loss that Kok intended to inflict is the difference between the amount of credit the bank extended based on the false representation and the amount of credit the bank would have extended had it known the company's true financial condition.

We therefore conclude that $149,288.43 of the $181,774.93 "loss" amount named by the district court was an estimate of loss to the lenders from lending more to the borrowers than the lenders would have lent without the fraud.

We need not decide whether the district court's § 2F1.1 calculation was correct in including the amount from fees received, because even without adding in the fees, the excess loan amount was $149,288.43. Section 2F1.1 only added one point for additional loss over the amount of $120,000, so Carter's guidelines range would have been the same even without adding in the fees. Accordingly, we conclude that the sentence of imprisonment was not based on an error in applying the guidelines. Furthermore, the sentence was not unreasonable in light of the factors mentioned in 18 U.S.C. § 3553.

Carter also challenges the restitution order. He does not argue that use of an unjust enrichment measure is an improper measure of a restitution award, and so we do not consider this issue. The entire restitution order was payable to the lenders, so we do not consider the amount by which Carter cheated the borrowers by making them sign notes for money that he skimmed off the top of their loans. We have already

-8-

determined that $149,288.43, the amount deposited in the Circle CM account, is a good proxy for the lenders' likely losses on the loans. However, the remainder of the restitution amount is the sum of all fees collected on the loans. At sentencing, Carter's counsel argued that at least one of those types of fee, the origination fee, was paid to the "bank," presumably referring to the lender. The government did not respond to this objection, and it was never addressed or rebutted in any way. If in fact any of the fees were paid to the lender then those fees should not be included in the restitution. See United States v. Scott, 74 F.3d 107, 110-11 (6th Cir. 1996) (restitution order cannot include amounts already collected by victim). We remand for a factual determination of whether the lenders received those fees, and, if necessary, an adjustment of the amount of the restitution award.

Carter raises a cursory argument that "it does not appear that statutory deadlines were met in determining and documenting any losses to any victims," but this assertion appears to be part of his unsuccessful argument that the government failed to prove loss, rather than a separate procedural argument.

Finally, Carter contended at oral argument and by a Rule 28(j) letter that enhancement of his guideline sentence and his restitution order violated the Sixth Amendment. Carter did not object in the district court on the basis of Apprendi v. New Jersey, 530 U.S. 466 (2000), Blakely v. Washington, 124 S. Ct. 2531 (2004), or the constitutionality of the Sentencing Guidelines, so our review is for plain error. In order to conclude that the district court's use of the guidelines in sentencing constituted plain error, we would have to determine that there is a reasonable probability that Carter would have received a more favorable sentence but for the error. United States v. Pirani, 406 F.3d 543, 552 (8th Cir. 2005) (en banc). The record forecloses any probability of a more lenient sentence, since the district court expressly stated:

> After considering the totality of the circumstances involved in this matter, the Court is persuaded that the sanctions imposed are not only

consistent with the overall purpose of the criminal justice system, but the Sentencing Guidelines as well. I think we will get Mr. Carter's attention. He will be afforded an ample opportunity to do some reflective thinking. He'll gain respect for the law. It will not only deter him from engaging in similar activities in the future, but will also deter others in society who might be inclined to engage in similar activity.

On this record, we conclude there is no basis for plain error relief.

We affirm the sentence of imprisonment but remand for clarification, and, if necessary, revision of the order of restitution in accordance with this opinion.

_____