# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-3052

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the Eastern |
| | * | District of Arkansas. |
| Nelson Miller, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: April 16, 2009
Filed:  December 7, 2009

_____

Before RILEY, BENTON, and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Nelson Miller was convicted by a jury of conspiracy to commit wire fraud, see 18 U.S.C. § 371, and 15 counts of aiding and abetting wire fraud, see 18 U.S.C. §§ 2, 1343.  The district court[1] sentenced Miller to one year and one day imprisonment to be followed by five years supervised release.  The court also imposed a $40,000 fine. The government appeals Miller's sentence.  We affirm.

_____

[1]The Honorable J. Leon Holmes, Chief Judge, United States District Court for the Eastern District of Arkansas.

Neither party challenges the underlying convictions. We briefly state the relevant facts in the light most favorable to the jury verdict. United States v. Jenkins-Watts, 574 F.3d 950, 956 (8th Cir. 2009). Miller owned and operated Freedom Financial Services of Arkansas, Inc. ("Freedom Financial") and Absolute Abstract and Title, Inc. ("Absolute Abstract"). As a correspondent lender, Freedom Financial processed, packaged, and sold individual residential mortgage loans to lending institutions. Freedom Financial received commissions from the individual borrowers as well as various fees from the lenders who purchased the loans.

From January 2000 to March 2002, Miller and his coconspirators–various employees of Freedom Financial and Absolute Abstract including those at the management level–sent fraudulent loan documents to a number of lending institutions. The documents contained misrepresentations as to: the appraised value of the subject properties, qualifications of the borrowers, and the state of the title. The documents also concealed fees and service charges. Most often, the conspirators misrepresented the titles on the mortgage properties as free and clear of liens and encumbrances in order to conceal the borrowers' true credit worthiness, credit histories, and outstanding obligations to other lenders. Thus, the closed mortgage loans were actually "riskier" than Freedom Financial had represented. The false information, in all of its variations, was submitted by the conspirators through Freedom Financial to induce the lenders to purchase the loans. Testimony from representatives of each of the defrauded financial institutions established that none of the lenders would have bought the mortgages if there had been truthful and complete disclosure.

On December 8, 2004, a federal grand jury returned a 16-count indictment against Miller and his coconspirators. Count one alleged conspiracy to sell 84 fraudulent mortgages to financial institutions between January 1, 2000, and March 2002 in violation of 18 U.S.C. § 371. Counts 2 through 16 alleged 15 counts of aiding

and abetting wire fraud between August 31, 1999, and January 26, 2002, in violation of 18 U.S.C. § 1343 and § 2. These charges involved 15 of the loans encompassed in the conspiracy charge. Miller proceeded to trial, asserting the defense that he had not participated in the conspiracy or the fraud scheme and that his managers had done so without his knowledge. Several of Miller's coconspirators had pled guilty and testified as cooperating witnesses for the government. The jury found Miller guilty on all 16 counts.

The Presentence Investigation Report ("PSR") assigned Miller a category I criminal history because he had no prior convictions and a base offense level of 6. With regard to the amount of loss attributable to Miller for sentencing purposes, the PSR stated that he "was part of a mortgage fraud conspiracy involving loans totaling $3,770,784 which resulted in fees and commissions being paid fraudulently totaling $355,191."[2] PSR ¶ 29. The PSR's loss calculation was premised on the "gain" to Freedom Financial as a result of the mortgage fraud conspiracy, i.e. the fees and commissions paid to Freedom Financial. Id. Thus, the PSR recommended a 12-level enhancement based on a loss of $355,191. Id; see United States Sentencing Commission, Guidelines Manual, §2B1.1(b)(1)(G) (Nov. 2001) (providing for a 12-level enhancement for a loss between $200,000 and $400,000). The PSR did not address actual loss. In terms of intended loss, the PSR provided that "[t]here is no evidence the coconspirators intended to cause loss involving foreclosure to the lenders; their intent was to process the fraudulent loans and receive the fees and commissions. Foreclosures were an unintended result in some instances." PSR ¶ 29.

---

[2]The PSR identified 14 financial institutions that were victimized by the mortgage fraud and the amount of the fees each institution paid to Freedom Financial: Alliance Funding, $85,718.25; Countrywide Mortgage, $2,653.72; First Tennessee Bank, $4,024.00; First Union National, $101,983.91; Fremont Investment, $765.00; GMFS, $21,448.74; Meritech Mortgage Service, $9,126.18; New Century Mortgage, $2,482.00; New South Federal, $3,869.51; Nova Star Mortgage, $7,478.50; Ocwen Federal Credit Union, $9,228.42; Provident Bank, $53,999.50; Saxon Mortgage, $26,488.52; and Union Planters, $25,924.25. PSR ¶ 30.

In addition, the PSR recommended a two-level enhancement for an offense involving more than ten victims and committed through mass-marketing. PSR ¶ 37; see USSG §2B1.1(b)(2)(A)(i), (ii). The PSR also recommended increasing Miller's offense level to 24 for an offense deriving more than $1,000,000 in gross receipts from one or more financial institutions. PSR ¶ 38; see USSG §2B1.1(b)(12)(A). The PSR further applied a four-level aggravated role in the offense enhancement for a leader in an offense involving more than five participants. PSR ¶ 40; see USSG §3B1.1(a). Thus, the PSR placed Miller's total offense level at 28, which combined with his criminal history category resulted in an advisory Guidelines range of 78 to 97 months.

Miller objected to each of the enhancements as well as the language supporting them in the PSR. The government's sole objection to the PSR went to the proper amount of restitution. The government's response to Miller's sentencing memorandum stated:

> Defendant's Sentencing Memorandum begins with the premise that all agree that there is neither intended loss nor actual loss in this case. The government categorically rejects this premise. There is both intended loss and actual loss, however, both "reasonably cannot be determined," thus gain is used as an alternative calculation.

(Resp. Def.'s Sentencing Mem. 1.)

At sentencing, the district court sustained Miller's objection to the PSR's loss calculation. The district court concluded that the amount of actual loss could be determined but that the government had failed to offer any evidence as to this amount. The district court also concluded that there was no intended loss because there was: (1) no objection to that finding in the PSR and (2) no evidence of intended loss. The district court also rejected the PSR's substitute measure for loss as Miller's "gain," i.e., the fees and commissions paid to Freedom Financial, observing that the

-4-

Guidelines authorized such a substitution only where there is a loss that could not reasonably be determined. Having found no actual loss, the district court also sustained Miller's objection to the enhancement for an offense involving ten or more victims. See USSG §2B1.1(b)(2)(A)(i); USSG §2B1.1, comment. (n.3(ii)). The court then sustained Miller's objection to the mass-marketing enhancement, see USSG §2B1.1(b)(2)(A)(ii), explaining, "I don't think the crime itself was committed through mass marketing. The crime was the fraud that was committed on the lenders. And there was no[] mass marketing involved in that . . . ." (Sentencing Tr. vol. 2, 319-20.) The court also sustained Miller's objection to the enhancement for deriving more than $1,000,000 in gross receipts from one or more financial institutions. See USSG §2B1.1(b)(12)(A). However, the court overruled Miller's objection to the aggravated role in the offense enhancement. See USSG § 3B1.1(a).

The district court stated that Miller's base offense level was six, that there was a four-level enhancement for his aggravated role in the offense, see USSG §3B1.1(a), such that his total offense level was ten, and that he had a criminal history category of I. Thus, the district court calculated Miller's advisory Guidelines range as 6 to 12 months. The statutory maximum term of imprisonment Miller faced was five years on count 1 and thirty years each count for counts 2 through 16. The district court sentenced Miller to a year and a day of imprisonment. The government appeals the sentence imposed by the district court.

## II.

On appeal, we will review a sentence for an abuse of discretion, giving due deference to the district court's decision. First, we will ensure that the district court did not commit a significant procedural error, such as miscalculating the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain why a sentence was chosen. If the district court's decision is procedurally

sound, then we will consider the substantive reasonableness of the sentence imposed, applying an abuse-of-discretion standard.

United States v. Zastrow, 534 F.3d 854, 855 (8th Cir. 2008) (quotations and citations omitted).

The government alleges both procedural error and substantive unreasonableness. The government argues that the district court miscalculated Miller's advisory Guidelines range because the court erred in: (1) finding no loss attributable to Miller where the court should have calculated the amount of the loss based on the gain to Miller as a result of the fraud, (2) failing to apply the enhancement for an offense involving ten or more victims, and (3) failing to apply the mass-marketing enhancement. The government also contends that Miller's sentence is substantively unreasonable because it violates the requirements of 18 U.S.C. § 3553. We consider each argument in turn.

A.

The government first argues that the district court erred in determining that a loss of zero was attributable to Miller for the mortgage fraud scheme and that the court should have measured the loss by the "gain" to Miller–the fees and commissions to Freedom Financial on the 84 loans–totaling $355,191. "We review the district court's interpretation of loss as used in the Guidelines de novo, and its calculation of loss for clear error." United States v. Fazio, 487 F.3d 646, 657 (8th Cir.), cert. denied, 128 S. Ct. 523 (2007).

Under the Sentencing Guidelines, the offense level for fraud offenses increases based on the amount of the loss. See USSG §2B1.1(b). "As a general rule, the amount of loss is the greater of actual loss or intended loss." United States v. Parish, 565 F.3d 528, 534 (8th Cir. 2009); see USSG §2B1.1, comment. (n.2(A)). "Actual loss" is "the

reasonably foreseeable pecuniary harm that resulted from the offense." USSG §2B1.1, comment. (n.2(A)(i)). Intended loss is defined as "the pecuniary harm that was intended to result from the offense." Id. §2B1.1, comment. (n. 2(A)(ii)). "The court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined." Id. §2B1.1, comment. (n.2(B)); see Parish, 565 F.3d at 534. The government asserts that the proper measure of loss in this case is based on Miller's "gain" from his criminal conduct as there was both actual and intended loss but neither can be reasonably determined.

As to the district court's conclusion that there was no actual loss attributable to Miller, "we accord particular deference to [this] . . . determination because of the district court's unique ability to assess the evidence and estimate the loss." United States v. Boesen, 541 F.3d 838, 851 (8th Cir. 2008) (quotation omitted). The district court explained its decision, stating:

> [T]he loss could reasonably have been determined in precisely the way that [defense counsel] has argued . . . , that each of these loans, the transactions are all recorded in the courthouse somewhere. And[,] although it may have taken some time and effort to go to the courthouse and find when there had been foreclosures or if there had been foreclosures or to find out who is the current lender and then contact the lender, the losses all can be calculated. This is not a case in which it couldn't reasonably be determined. In fact, it could be. . . . And I don't think that there has been any proof of actual loss in this case.

(Sentencing Tr. vol. 2, 316-17.) In this case, the district court presided over a ten-day jury trial followed by an extensive sentencing hearing and, thus, was well aware of the evidence offered by the government in this case. The government has cited no reason we should not defer to the district court's actual loss conclusion, Boesen, 541 F.3d at 851, and, finding none, we affirm.

With regard to intended loss, the district court found no such loss because the government failed to object to the PSR's factual allegation that Miller did not intend foreclosure loss. The court went on to state that, even if the government had objected, there was no evidence of intended loss. The PSR and the district court operated under the view that, in this case, intended loss consisted of only intended *foreclosure* loss. This interpretation of intended loss is too narrow in light of this court's precedent. Here, the amount of intended loss attributable to Miller is the amount by which the fraudulent loans purchased by the financial institutions exceeded the amount that those institutions would have paid had they known the truth. See United States v. Carter, 412 F.3d 864, 869 (8th Cir. 2005) (providing that the proper measure for intended loss is the "amount . . . by which the fraudulently-obtained loan exceeded the amount that the lenders would have lent on the property had they known its true value"); Kok v. United States, 17 F.3d 247, 250 (8th Cir. 1994) ("[T]he measure of the loss that [the defendant] intended to inflict is the difference between the amount of credit the bank extended based on the false representations and the amount of credit the bank would have extended had it known the company's true financial condition.").

Carter involved fraud in the loan application context, 412 F.3d at 866, and the fraud in Kok was in regard to a line of credit, 17 F.3d at 249. However, the same principle that governs those cases applies to Miller's fraud as a correspondent lender because it had the same result–the financial institutions he defrauded took on more risk than was represented to them. Moreover, following Carter, a determination that there is intended loss attributable to Miller is not precluded even though: (1) none of the fraudulent loans had been foreclosed at the time of his sentencing, see 412 F.3d at 869 (providing that "even if no mortgages have been foreclosed [at the time of sentencing], the lenders have still suffered a loss, since they have been left with riskier, hence less valuable loans than they meant to contract"), and (2) he intended that all of the loans be repaid, see id. (stating that "even though Carter testified that he thought the loans would be repaid, Carter intended to leave the lenders with loans

that were riskier and less valuable than the lenders thought"). Thus, the intended loss that should have been attributed to Miller is the amount by which the purchase price of the mortgage loans exceeded the amount that the defrauded financial institutions would have paid absent the fraud. However, the government has never argued that this is the proper measure for calculating the intended loss in this case and, in fact, has asserted that it is inapplicable.[3] Therefore, we decline to apply this measure to determine the intended loss attributable to Miller for sentencing purposes as "[t]his court, of course, does not normally address issues not raised in the district court nor does it normally address issues not raised by a litigant on appeal." Latorre v. United States, 193 F.3d 1035, 1037 n.1 (8th Cir. 1999); see also United States v. Walrath, 324 F.3d 966, 970 n.2 (8th Cir. 2003) (declining to address an argument that was not raised before the district court, in the briefs, or at oral argument). Accordingly, we cannot determine that the district court clearly erred in its finding that there was no

---

[3]The government cited this court's line of cases addressing intended loss in the mortgage application fraud context, including Carter, but asserted:

> Those cases are distinguishable from Nelson Miller's crime in that, at the time those frauds were committed, the intended object of the fraud, as perpetrated by a borrower/broker, was to actually realize only that certain net amount from his mortgage application fraud scheme, not to realize the full face value sales price on a security. Here, correspondent lender Nelson Miller's intended object at the time of the fraud, was to realize the full face value sales price of the amount for each closed mortgage package. Nelson Miller passed along all risk, stood to lose nothing after he completed his sale, and received full value, his "intended loss." Miller's fraud was never simply the application for mortgages on real property, and providing collateral. His objective at the time he formed his criminal intent was to obtain the full amount of the sales price, his "intended loss."

(Gov't Br. 31-32.)

intended loss attributable to Miller on a basis that was never argued either to the district court or to this court on appeal.[4]

Where there is no actual loss and no intended loss, the Guidelines do not permit the substitution of the "gain" measure for loss. USSG §2B1.1, comment. (n.2(B)) (directing the sentencing court to "use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined"). In other words, "[t]he defendant's gain may be used only as an 'alternative estimate' of [the] loss; it may not support an enhancement on its own if there is no actual or intended loss to the victims." United States v. Haddock, 12 F.3d 950, 960-61 (10th Cir. 1993); see United States v. Schneider, 930 F.2d 555, 559 (7th Cir. 1991) (holding that no loss enhancement was appropriate where there was no actual or intended loss even though defendants would have profited from fraudulently obtained contracts). Thus, the district court properly declined to use Miller's gain–the fees and commissions paid to Freedom Financial–as the measure for the loss in this case. In sum, the district court did not clearly err in finding that there was no loss to attribute to Miller for sentencing purposes.

## B.

Next, the government contends that the district court erred in sustaining Miller's objection to the enhancement applicable for an offense involving more than ten victims and/or mass-marketing. See USSG §2B1.1(b)(2)(A). "We review the district

---

[4]The government also presented the conflicting argument that the intended loss attributable to Miller was the entire amount of the fraudulent loans, totaling $3,770,784, based on the testimony from the representatives of the defrauded financial institutions that none of the lenders would have bought the mortgages absent the fraud. However, in light of our determination as to the proper measure for the intended loss in this case, this argument fails.

court's interpretation and application of the guidelines *de novo* and its findings of fact for clear error." Jenkins-Watts, 574 F.3d at 960.

Section 2B1.1(b)(2)(A) provides for a two-level increase for offenses involving ten or more victims or mass-marketing. We first consider the "victim" enhancement. See USSG §2B1.1(b)(2)(A)(i). "'Victim' means (I) any person who sustained any part of the *actual loss* determined under subsection (b)(1); or (II) any individual who sustained bodily injury as a result of the offense." Id. §2B1.1, comment. (n.3) (emphasis added). We have already determined that the district court did not clearly err in determining that the government failed to prove any actual loss in this case. It necessarily follows that there were no "victims" within the meaning of USSG §2B1.1(b)(2)(A)(i). Therefore, the district court did not err in denying the victim enhancement under USSG §2B1.1(b)(2)(A)(i).

Next, we address the mass-marketing enhancement. See USSG §2B1.1(b)(2)(A)(ii). "'Mass-marketing' means a plan, program, promotion, or campaign that is conducted through solicitation by telephone, mail, the Internet, or other means to induce a large number of persons to (I) purchase goods or services; (II) participate in a contest or sweepstakes; or (III) invest for financial profit." USSG §2B1.1, comment. (n.3(A)). The government argues that the mass-marketing enhancement applies because, although Miller did not engage in mass-marketing to the financial institutions he defrauded, he did engage in mass-marketing to consumers via television commercials. In sustaining Miller's objection to the mass-marketing enhancement, the district court explained, "I don't think the crime itself was committed through mass marketing. The crime was the fraud that was committed on the lenders. And there was no[] mass marketing involved in that . . . ." (Sentencing Tr. vol. 2, 319-20.) The language of the enhancement clearly states that the offense itself must involve mass-marketing in order for the enhancement to apply. See USSG §2B1.1(b)(2)(A)(ii). Miller participated in a mortgage fraud conspiracy involving fraud on financial institutions, not consumers, thus, we find no error in the district

court's analysis. Accordingly, the district court did not err in denying the mass-marketing enhancement under USSG §2B1.1(b)(2)(A)(ii).

## C.

The government's final argument is that Miller's sentence does not conform to the requirements of 18 U.S.C. § 3553. This is an attack on the substantive reasonableness of Miller's sentence which we review for abuse of discretion. United States v. Clay, 579 F.3d 919, 930 (8th Cir. 2009). "A district court abuses its discretion when it fails to consider a significant relevant factor, gives significance to an improper or irrelevant factor, or considers proper factors, but in weighing the factors commits a clear error of judgment." Id. Specifically, the government asserts that Miller's sentence does not reflect the seriousness of the offense, promote respect for the law, or provide a just punishment, see 18 U.S.C. § 3553(a)(2)(A), or afford adequate deterrence to criminal conduct, see id. § 3553(a)(2)(B), because it fails to hold Miller responsible for the "loss" associated with his crimes. However, in light of our affirmance of the district court's calculation of the loss attributable to Miller for sentencing purposes, we find no abuse of discretion on this basis.

## III.

For the foregoing reasons, we affirm Miller's sentence.

_____

-12-