15-2408
*United States v. Meislin*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

**SUMMARY ORDER**

**Rulings by summary order do not have precedential effect. Citation to a summary order filed on or after January 1 2007 is permitted and is governed by Federal Rule of Appellate Procedure 32.1 and this court's Local Rule 32.1.1. When citing a summary order in a document filed with this court, a party must cite either the Federal Appendix or an electronic database (with the notation "summary order"). A party citing a summary order must serve a copy of it on any party not represented by counsel.**

At a stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, at 40 Foley Square, in the City of New York, on the 3rd day of November, two thousand sixteen.

Present:    ROBERT A. KATZMANN,
                   *Chief Judge*,
            RICHARD C. WESLEY,
            SUSAN L. CARNEY,
                   *Circuit Judges*.

_____

UNITED STATES OF AMERICA,

                   *Appellee*,
            v.                                         No. 15-2408

MAHESH KUTHURU

                   *Defendant*,

BONNIE MEISLIN,

                   *Defendant-Appellant.*

_____

For Appellee:                    STEVEN D. CLYMER, Assistant United States Attorney (Edward R. Broton, Assistant United States Attorney, *on the brief*), *for* Richard S. Hartunian, United States Attorney for the Northern District of New York, Albany, NY.

For Defendant-Appellant:         KIMBERLY M. ZIMMER, Syracuse, NY.

1

Appeal from the United States District Court for the Northern District of New York (Hurd, *J.*).

**ON CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED,** and **DECREED** that the judgment of the district court is **AFFIRMED**.

Defendant Bonnie Meislin appeals from a judgment of the United States District Court for the Northern District of New York (Hurd, *J.*) entered July 21, 2015, convicting her of 23 counts of health care fraud in violation of 18 U.S.C. § 1347 and one count of conspiracy to commit health care fraud in violation of 18 U.S.C. § 371 and 18 U.S.C. § 1035. We assume the parties' familiarity with the underlying facts, the procedural history of the case, and the issues on appeal.

The charges against Meislin stem from the Medicare "Incident To" guidelines. Pursuant to these provisions, a physician's assistant ("PA") or nurse practitioner ("NP") seeing patients under a physician's "direct supervision" can bill Medicare as though the physician saw the patient. App. 687. Direct supervision "does not mean that the physician must be present in the same room as his or her aide," but does require that the physician "be present in the office suite and immediately available to provide assistance and direction throughout the time the aide is performing the services." App. 689. If a physician is not directly supervising a PA or NP, that aide may bill for services only if he or she is separately credentialed by Medicare. Medicare provides reimbursement for services performed by unsupervised PAs and NPs at a rate 15% lower than that for services performed by physicians.

The evidence at trial established the following. Meislin worked as the billing manager for Dr. Mahesh Kuthuru at Upstate Pain Management ("UPM") in upstate New York. From January 2010 to September 2011, Kuthuru was primarily residing in Las Vegas, Nevada.

2

Because the PAs and NPs at UPM were not credentialed by Medicare, Meislin could not submit claims for Medicare reimbursement under their names. Instead, during this period, she submitted Medicare claims falsely indicating that Kuthuru had either personally performed services or directly supervised the PAs and NPs at UPM on days when Kuthuru was actually in Las Vegas. By billing in this way, Meislin caused UPM to receive Medicare reimbursement to which it was not entitled. Meislin was convicted for her role in this scheme after a jury trial and sentenced principally to fifteen months' imprisonment.

On appeal, Meislin argues that (1) the district court abused its discretion by admitting into evidence hearsay statements made by Kuthuru, evidence about her billing activities at a prior job, and Medicare claims data; (2) the evidence was insufficient to support her convictions; and (3) the district court erred in calculating loss and restitution at sentencing.

## I.    Evidentiary Rulings

"We review admissibility of evidence at trial for abuse of discretion." *United States v. Williams*, 585 F.3d 703, 707 (2d Cir. 2009).

### A.    Kuthuru's Statements

Meislin challenges the district court's decision to permit Brittany Hosea, a former UPM employee, to testify about a conversation Hosea had with Kuthuru. According to Hosea, shortly before that conversation, Meislin had instructed Hosea "to make . . . notes appear" for patients who had been "no shows and cancellations." App. 534. Hosea refused because, in her view, "that is fraud." App. 534. Hosea testified that Kuthuru then called her and asked if she had a problem. When Hosea indicated that she would not commit fraud, Kuthuru said "if you can't do your job, you know where the door is." App. 537.

Questions and commands are ordinarily not hearsay because they are not offered for the truth of the matter asserted, *see United States v. Bellomo*, 176 F.3d 580, 586 (2d Cir. 1999); *United States v. Oguns*, 921 F.2d 442, 449 (2d Cir. 1990), and "threats are verbal acts," not hearsay, *United States v. Stratton*, 779 F.2d 820, 830 (2d Cir. 1985). Kuthuru's last statement to Hosea, whether construed as a command, an ultimatum, or a threat, was not an assertion offered for its truth. As a result, neither that statement nor Kuthuru's question constituted hearsay and the district court did not abuse its discretion by admitting this testimony.

## B.     Prior Act Evidence

Meislin next argues that the district court should not have allowed Erica Stell, Meislin's former coworker, to discuss Meislin's billing practices at a previous job. Stell testified that Meislin admitted to using improper billing practices for her former employer, another doctor, despite knowing that it was wrong to do so because Meislin could not "make th[e] kind of money" she made working for that doctor "anywhere else." App. 928. The district court admitted this testimony to show "the state of mind of the defendant," particularly "her motive, intent, plan, knowledge, and absence of mistake." App. 894.

A party may not use "[e]vidence of a crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Evidence of prior acts, however, "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2).  This Court has adopted the "inclusionary" approach to Rule 404(b), admitting "all 'other act' evidence that does not serve the sole purpose of showing the defendant's bad character and that is neither overly

4

prejudicial under Rule 403 nor irrelevant under Rule 402." *United States v. Curley*, 639 F.3d 50, 56 (2d Cir. 2011).

Because Meislin argued at trial that she lacked a motive to commit the charged offense, testimony tending to establish motive was relevant. *See* Fed. R. Evid. 401(a). To show how Meislin benefitted from the fraudulent scheme, the government introduced evidence that she made considerably more money than any other member of the UPM office staff, including the office managers. Meislin's candid admission to Stell about her susceptibility to financial pressure and inability to "make this kind of money anywhere else," App. 928, which appears to mean without billing improperly, "tend[s] to make [it] . . . more . . . probable" that Meislin's high salary at UPM was due to her willingness to bill improperly and that she thus had a financial motive to engage in the alleged scheme, Fed. R. Evid. 401(a).

Moreover, Meislin has not shown that admission of Stell's testimony was unfairly prejudicial. While Meislin argues that her former coworker's testimony "was by far the most damaging evidence admitted against [her]," Def. Br. 47, this Court has noted that "any proof highly probative of guilt is prejudicial to the interests of that defendant," *United States v. Gelzer*, 50 F.3d 1133, 1139 (2d Cir. 1995). For this reason, "[t]he prejudice that Rule 403 is concerned with involves 'some adverse effect . . . beyond tending to prove the fact or issue that justified its admission into evidence.'" *Id.* (quoting *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980) (second alteration in original). Furthermore, any risk of unfair prejudice was mitigated by the district court's limiting instruction, taken from "the model language of the *Sand* federal charge," which this Court has "endorsed on several occasions." *United States v. Brand*, 467 F.3d 179, 206 (2d Cir. 2006). For these reasons, the district court did not abuse its discretion in admitting Stell's testimony.

5

## C. Medicare Claims Data in Government Exhibits 42 and 50

Meislin next argues that the government did not comply with Federal Rule of Evidence 1006 when it introduced as summary charts Government Exhibits 42 and 50, which consist of raw data, depicted in spreadsheet form, from the Medicare claims that Meislin submitted from November 1, 2009 to April 30, 2012. Because these spreadsheets, approximately 600 pages long, were not created to summarize underlying data but in fact contain the entire data set from the relevant period, they are not "summary" charts and are not subject to the requirements of Rule 1006.

Meislin further argues that she received insufficient notice of the government's intent to offer these exhibits in violation of Federal Rule of Evidence 902(11). Although the government's notice mistakenly referenced Exhibit 42 (a subset of the data) instead of Exhibit 50 (the entire data set), the certification accompanying the notice accurately described the *contents* of the exhibits as all claims data submitted to Medicare by UPM from November 1, 2009 to April 30, 2012. This clear indication of the substance of the exhibits was sufficient to provide Meislin with "adequate time to investigate and challenge the adequacy of the underlying records." *United States v. Komasa*, 767 F.3d 151, 155 (2d Cir. 2014) (citing *United States v. Daniels*, 723 F.3d 562, 579–81 (5th Cir. 2013)).

Finally, Meislin argues that these exhibits were not properly admitted as business records because the entity through which they were introduced was not the entity that created the data. Records maintained but not created by a company may be admissible as business records of that company "if witnesses testify that the records are integrated into [the] company's records and relied upon in its day-to-day operations." *Id.* at 156 (quoting *In re Ollag Constr. Equip. Corp.*, 665 F.2d 43, 46 (2d Cir. 1981)). The claims data in Exhibits 42 and 50 was admitted as a

business record of Safeguard Services, a Medicare contractor. Penni Conley, a Medicare fraud investigator employed by Safeguard Services, testified that claims data is maintained in a data warehouse operated by Safeguard Services and that she relied on that data in her role as a fraud investigator for Medicare. Conley further testified that it is standard practice for Medicare claims to be submitted by a medical practice and processed by a fiscal intermediary who pays the claims, in this case a company called National Government Services. The intermediary then transmits the underlying claims data to Medicare contractors like Safeguard Services. Conley's testimony was accompanied by a certification from the custodian of records for Safeguard Services attesting that the claims data met the requirements of Federal Rule of Evidence 803(6). In light of this evidence, the government established that the claims data constituting Exhibits 42 and 50 was a Safeguard Services business record "kept in the course of a regularly conducted business activity." *Komasa*, 767 F.3d at 156 (quoting *United States v. Williams*, 205 F.3d 23, 34 (2d Cir. 2000)); *see also* Fed. R. Evid. 803(6)(B). The fact that government attorneys made some revisions to the exhibits does not undermine their authenticity or call into question whether the data was "what the proponent claim[ed] it [wa]s," Fed. R. Evid. 901(a), because Conley, who provided the data, testified at trial that she was "familiar with the various revisions as they occurred," App. 731.

As a result, the district court did not abuse its discretion in admitting Exhibits 42 and 50.

## II.     Sufficiency of the Evidence

"[A] defendant challenging the sufficiency of the evidence . . . at trial bears a heavy burden, as the standard of review is exceedingly deferential." *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012) (internal quotation marks and citations omitted). "In evaluating a sufficiency challenge, we 'must view the evidence in the light most favorable to the government,

crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence.'" *Id.* (quoting *United States v. Chavez*, 549 F.3d 119, 124 (2d Cir. 2008)). "A judgment of acquittal is warranted only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Jiau*, 734 F.3d 147, 152 (2d Cir. 2013) (internal quotation marks and alterations omitted).

To establish a violation of 18 U.S.C. § 1347, the government must prove "knowing and willful participation" in a scheme to defraud a health care benefit program, *United States v. Gabinskaya*, 829 F.3d 127, 132 (2d Cir. 2016), with "fraudulent intent," *United States v. Singh*, 390 F.3d 168, 188 (2d Cir. 2004). "To sustain a conspiracy conviction, the Government must present some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it." *Coplan*, 703 F.3d at 62 (quoting *United States v. Rodriguez*, 392 F.3d 539, 545 (2d Cir. 2004)).

At trial, the government presented evidence that Meislin received the UPM billing manual which described the "Incident To" guideline, had at least one conversation about Incident To billing improprieties at UPM, and admitted to Conley that she was "very familiar with Medicare" billing and "knew all about" the topic Conley was discussing—the Incident To guideline. App. 703-705. The government further presented evidence showing that Meislin was the UPM employee responsible for submitting claims to Medicare, was the only employee working at UPM for the entirety of the relevant period, had a substantially higher salary than other members of the UPM office staff, enlisted Kuthuru's intervention when an employee

8

refused to take action that employee considered fraudulent, and continued submitting false claims even after being informed of their falsity. Based on this record, it cannot be said that evidence of Meislin's knowledge of and willful participation in a fraudulent scheme was "nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *Jiau*, 734 F.3d at 152 (alterations, citation, and internal quotation marks omitted).

## III.    Loss and Restitution Calculations

"[T]his Court reviews the district court's loss determination for clear error." *United States v. Lacey*, 699 F.3d 710, 719 (2d Cir. 2012). Similarly, "findings of adjudicative fact" in connection with restitution orders are reviewed for clear error. *United States v. Jaffe*, 417 F.3d 259, 263 (2d Cir. 2005).

Meislin argues that the district court erred in calculating loss and restitution because its calculations did not comport with Exhibit 42, contained duplicate and non-fraudulent claims, and failed to account for reimbursement that UPM could lawfully have received for services provided by its PAs and NPs. However, the district court's loss calculation was not limited to claims set forth in Exhibit 42 because that exhibit contained only a subset of the claims Meislin submitted. Although Exhibits 42 and 50 did include some duplicate and non-fraudulent claims, Probation represented to the district court that the loss calculation in the Presentence Report did not include such claims. Given that the district court "need only make a reasonable estimate of the loss . . . based on available information," U.S.S.G. § 2B1.1 n.3(C), *see also United States v. Uddin*, 551 F.3d 176, 180 (2d Cir. 2009), Meislin does not explain here why Probation's representation on this point should be disregarded, nor does she provide any basis for us to conclude that the district court erred in crediting that representation in the absence of any challenge to its accuracy below.  Additionally, the loss attributable to Meislin's fraud was not

9

limited to the 15% difference between the physician and PA or NP reimbursement rates because the PAs and NPs at UPM were not credentialed by Medicare and were thus not entitled to any Medicare reimbursement for services performed at UPM.

We have considered all of Meislin's remaining arguments and conclude that they lack merit. For the reasons given, we **AFFIRM** the judgment of the district court.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk